**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTHERN IOWA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GWYNETH CHARLTON<br><br>Plaintiff,<br><br>v.<br><br>FORD MOTOR COMPANY, a Delaware Corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 3:24-CV-00085-RGE-WPK<br><br>**FORD MOTOR COMPANY'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF CHRISTOPHER CARUSO** |

Defendant, Ford Motor Company ("Ford"), by its attorneys Robert V.P. Waterman, Jr. and Abbey C. Furlong of Lane & Waterman LLP, and Patrick X. Fowler of Snell & Wilmer LLP, submits the following motion to exclude the testimony of Christopher Caruso pursuant to Federal Rules of Evidence 702 and 403.

**BACKGROUND**

This is a products liability action in which Plaintiff, Gwyneth Charlton, asserts that a design defect in the airbag system of a 2013 Ford Fusion caused her injuries.

To support her claim, Plaintiff intends to present an expert witness, Christopher Caruso, to testify about the design of the crash sensing system within the supplemental restraint system – primarily airbags – in the 2013 Ford Fusion. (Caruso Depo., attached as Exh. A). Pursuant to his *curriculum vitae*, before he became a full-time testifying witness in 2007, Mr. Caruso worked as an airbag sensor system engineer for many years for Delphi/Delco, a subsidiary of General Motors. Plaintiff intends to have Mr. Caruso testify that the airbag sensing system in the 2013 Fusion was defective because the airbags deployed in this crash; he contends that the crash was not severe enough to warrant the deployment of the airbags. Mr. Caruso testified at his deposition that, “the

defect opinion is that the airbags shouldn't have fired at all." (Exh. A at 69).[1]

Ford moves to exclude Mr. Caruso's opinion because it is not the product of a reliable methodology reliably applied to the facts here, it is not based on sufficient facts or data, and is nothing more than inadmissible *ipse dixit*. His testimony will not assist the jury in deciding contested issues at this trial.

Mr. Caruso's methodology is replete with irrelevant calculations and variables. Most critically, he violates a fundamental tenet of airbag system engineering, i.e., airbag deployment decisions are made during the initial milliseconds of a crash. He expressly ignores this settled principle and instead reaches his opinion that the airbag should not have deployed by considering the ***full length*** of the crash pulse. Mr. Caruso's hindsight approach is contrary to airbag design standards.

Second, while Mr. Caruso does not dispute that the vehicle testing conducted by Ford was reasonable, he nevertheless faults Ford for not conducting an additional crash test the parameters of which he is not able to even identify. Moreover, to the extent Mr. Caruso bases his opinion on test data regarding occupants who are seated in an entirely different configuration than Plaintiff, this cannot form the basis for a reliable opinion based on sufficient facts or data.

### A. Accident

Plaintiff, then fifteen years old, was driving a 2013 Ford Fusion, at approximately 9:05 p.m. on January 21, 2023 in Iowa City, with her teenage friend in the passenger seat. This was her first time driving without adult supervision inside the vehicle. Plaintiff is of small-stature (4'10" and 105 lbs.); she had the driver seat approximately two-plus inches rearward of full forward on

[1] Through another expert witness, Kelly Kennett, Plaintiff intends to show that the airbag deployment caused her injuries, and that she would have been uninjured in the crash had the driver airbag not deployed. Ford has filed a separate motion to exclude Mr. Kennett's opinions.



Error! Unknown document property name.

the seat track and sat on an after-market seat cushion to help her see over the hood. While driving during wintery conditions, Plaintiff lost control when the vehicle slid on ice, and she crashed into and knocked over a wooden utility pole off the right side of the road. The impact speed was 28.3 mph. The photo below was taken at the crash scene showing the point of rest and damage to the Ford Fusion.



The frontal, knee bolster, and side airbags deployed during the crash. During the airbag deployment, an unidentified object struck Plaintiff in her face, resulting in fractures around her right eye, and an injury to her right eye globe that eventually led to its removal. Plaintiff's passenger was uninjured.

### B. Airbag Systems Are Predictive and Must Make Deployment Decisions Based on Early Crash Data

In passenger vehicles, airbag systems are considered "supplemental restraint systems" because they supplement the primary restraint system, which is the safety belt. As noted in the 2013 Ford Fusion's Owner's Manual, "the driver and front passenger airbags will deploy during significant frontal and near frontal crashes." (Owner's Manual at 34, attached as Exh. B). They "are designed to work with the safety belts to help protect the driver and front seat passenger from



Error! Unknown document property name.

certain upper body injuries. Airbags do not inflate slowly; there is a risk of injury from a deploying airbag." (*Id*. at 33.)

As Mr. Caruso agreed at his deposition, if airbags are to deploy in a crash in time to provide protection, they must do so in the early stages of the crash event. Thus, they are by necessity ***predictive*** in nature. (Exh. A at 70). An airbag system "can't wait until the crash is nearly over to decide whether to deploy the airbag." (*Id*. at 70). Because if it did, Mr. Caruso agreed that "either it won't provide any protection at all if it's too late or you have the occupant getting too close to the airbag, and it increases the risk of an airbag-induced injury." (*Id*. at 70). Because of this, in a crash like this one, Mr. Caruso noted that the crash tests in Ford's crash test calibration summaries reported deployment command times within the first 35 to 46 milliseconds after the start of the crash. (*Id*. at 70-71). Mr. Caruso then agreed that a deployment decision time of 45 milliseconds was reasonable if the decision to deploy was made. (*Id*.) Here, the crash data from the Fusion shows that the deployment command was made 46 milliseconds after the crash began. (*Id*. at 127-28). The total recorded length of the crash was approximately 290 milliseconds. (*Id*. at 128-29).

Vehicle accelerations and decelerations during the duration of a crash are referred to as the crash pulse and may be recorded as such in a graph. The predictive nature of the airbag system and the limited amount of time and data that it must work within to decide whether to deploy or not can be explained by the following graph, which was prepared by Ford's airbag system expert, Ram Krishnaswami. (Krishnaswami Expert Report, attached as Exh. C).

Figure 4 from Ram Krishnaswami Expert Report – Comparing EDR download with crash test 18823 Front Angular Right Impact




The chart contains a plot of the recorded crash pulse from the subject crash (the red dashed line) and the plot of the recorded data from a 19-mph front angle barrier crash test 18823 (the green line) run by Ford during the development of the 2013 Fusion. The data traces show the acceleration (G force) over time from the start of the crash pulse through 250 milliseconds. The steeper the slope of the lines, the more severe the crash pulse is – more acceleration over a shorter period of time. The flatter the slope, the less severe.

The vertical blue line is set at 46 milliseconds, which is when the airbag system in the Fusion made the decision to trigger the deployment of the airbags. When the airbag system made that decision, the only crash severity data available to it is what was recorded up to that time, i.e., to the left of the blue line. Crash test 18823 was one of the tests used to calibrate, or teach, the

airbag system how to discern crashes that warranted an airbag deployment from those that did not.[2] Crash test 18823 was a "must deploy" airbag crash based on the severity of the crash pulse. Comparing the green crash pulse and the dotted red crash pulse during the first 46 milliseconds, they appear very similar, and in fact the subject crash pulse was even more severe just before the deployment decision was made at 46 milliseconds. Based on the severity of the crash pulse up to the time it had to decide whether to deploy the airbag, the subject crash pulse looked at least as severe as the known must-deploy, and so based on that data, it triggered the airbag deployment.[3] After 46 milliseconds, the slope of the dotted red line showing the subject crash pulse does flatten out – showing a less severe crash pulse relative to the pulse of crash test 18823. The crash severity *after* the airbags were commanded to deploy is *irrelevant* to the question of whether the airbags should have deployed.

**C. <u>Mr. Caruso's Opinions</u>**

At the outset, Mr. Caruso concedes that the airbag system performed exactly as it was designed, and that this case does not involve a manufacturing defect. (*Id.* at 74). There were no diagnostic trouble codes. (Exh. A at 73).

Likewise, he has:

---

[2] The airbag system in every vehicle, including the 2013 Fusion, is calibrated to either deploy or not deploy based on, among other things, a library of crash tests conducted during the development of the vehicle program. (Exh. C at 6).

[3] As Ford's expert, Mr. Krishnaswami, described in his report, "Based on available data early in the crash sequence, a deployment (or suppression) decision is made. In comparing the 19 mph Front Angular Right crash test 18823 (a "must-fire" test) with the RCM download from the subject crash, it can be seen that the subject crash matches the rate of change in velocity with appropriate time shifts . . . . The real-time decision made by the sensing system based on available data at that point in time indicates that the crash severity was classified appropriately as requiring the frontal airbag deployment." (Exh. C at 5).

- no criticism of the placement location and mounting structure and method of the front crash sensors and the restraint control module (RCM); indeed, he noted that "sensor location is actually very good" (*Id.* at 43-45, 66);
- no criticism of the sensor hardware (*Id.* at 66);
- no criticism of the design strategy, adding it was consistent with the industry in 2013 and probably even today (*Id.*);
- no criticism of the timing of the stage 1 and 2 airbag deployment, or the timing of the deployment of the inflatable knee bolster, seatbelt pretensioners, and anchor pretensioners (other than the fact that he contends that the airbags should not have deployed at all in this crash). (*Id.* at 68-69).

(*See also* Caruso Expert Report at 12-13, 15, attached as Exh. D).

Additionally, and importantly, between his rebuttal report and his deposition, Mr. Caruso recanted or withdrew many, if not most of the opinions listed in his original report that were critical of Ford and the airbag system design. Specifically, he originally opined that the "decision here to allow a deployment for the belted occupant as low as 12 mph was defective, unsafe, and unreasonably dangerous." (Exh. A at 87; Exh. D at 21-22). He also originally opined that "in a reasonably designed, state of the art system in 2013 model year," a belted occupant should not have seen frontal impact airbag deployment until the severity level reached 18 mph full frontal rigid barrier impact; adding "[t]his is even more crucial when we have a forward seated occupant." (Exh. D at 22; Exh. A at 90-91, 132). In other words, Ford's decision to set the "must fire" threshold at 12 mph instead of 18 mph, rendered the airbag defective, unsafe, and unreasonably dangerous – according to Mr. Caruso.

By the time of his deposition, however, and after reviewing the Rule 26 report authored by



**Error! Unknown document property name.**

Ford's airbag design expert, Ram Krishnaswami, Mr. Caruso made it clear that he no longer held these opinions. He noted: "I don't know what the decision were to go to 12, but I can't argue with Mr. Krishnaswamy's description of what they chose to do. . . ." (Exh. A at 87). As he explained: "based on what we know now, [] the decision to deploy the belted occupant airbag at 12 mph for a forward seated occupant I would not consider defective." (Exh. A at 88; *see also* at 91, 94, 131-33).[4] Similarly, he withdrew his originally proposed alternative system design that included a must fire threshold of 16 to 18 mph. (Exh. A at 101; Exh. D at 29).

Ultimately, Mr. Caruso is left with one fundamental opinion, i.e., that the airbags should not have deployed in this crash. (Exh. A at 66, 69). He explained: the crash was "never actually severe enough to cause any harm to Ms. Charlton in and of itself, a belted occupant with this level of G force. . . that's why delta-v versus time is so important . . . she was never in any serious risk where she needed an airbag. . . ." (*Id.* at 75).

Mr. Caruso has not identified an alternative design to address what he described as a "system [that] is overly sensitive." (*Id.* at 136). And while he criticized Ford for not conducting an additional crash test during the development of the 2013 Ford Fusion airbag system in which the airbag would not deploy, he readily admitted that he could not identify the crash mode for such a test, nor the speed or impact angle for such a test. (*Id.* at 130-31).

## ARGUMENT

[4] After he read Mr. Krishnaswami's report which established that – unlike Mr. Caruso's original belief – forward belted occupants (like Plaintiff) are treated like unbelted occupants. (Exh. A at 76-77). Mr. Caruso acknowledged that he is not a biomechanic and therefore does not criticize or dispute Ford's decision to offer a forward seated belted occupant the same protection as unbelted occupants because it is a "biomechanical decision that is out of [his] scope of knowledge." (*Id.* at 83, 85). In his supplemental report, he stated: "I concur that in general terms, Ford does, in fact, use the seat position and seatbelt status to tailor their airbag deployment threshold conditions, which was appropriate and reasonable in the 2013 model year." (Exh. E at 2; *see also* Exh. A at 105-06, 111).

Under Federal Rule of Evidence 702, expert testimony must be offered by a witness qualified as an expert by knowledge, skill, experience, training, or education; assist the trier of fact to understand the evidence or determine a fact in issue; be based on sufficient facts or data; and be the product of reliable principles and methods that have been reliably applied to the facts of the case. *See also Sprafka v. Med. Device Bus. Servs., Inc*., 139 F.4th 656 (8th Cir. 2025). Relatedly, nothing in *Daubert* requires a court "to admit opinion evidence that is connected to existing data by the *ipse dixit* of the expert" and a court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Importantly, the Eighth Circuit recently recognized that in 2023, Rule 702 was amended "'to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule.'" *Sprafka*, 139 F.4th at 660 (citing Fed. R. Evid. 702, Advisory Committee notes to 2023 amendment). As the court explained: "The Committee concluded this emphasis was necessary because many courts had incorrectly held 'that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility.'" *Id*. at 660 n.3.

The amendment underscores the Court's "gatekeeping role to assure that evidence admitted in a case is both relevant and reliable." *Id*. at 660-61. "As the gatekeeper, a district court's role is to discern expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Id*. at 661 (internal quotations and citation omitted).

## I. MR. CARUSO'S OPINION THAT PLAINTIFF'S AIRBAG SHOULD NOT HAVE DEPLOYED IS NOT BASED ON A RELIABLE AND RELEVANT BASIS AND IS NOT BASED ON SUFFICIENT FACTS OR DATA

At the conclusion of his deposition, Mr. Caruso had one remaining, fundamental opinion:

the airbag should not have deployed, and it did because the system misclassified this crash as being more severe than he thinks it actually was. For the reasons set forth herein, it should be excluded.

### A. Mr. Caruso's Methodology Ignored The Fundamental Tenet Of Airbag Deployment That The Deployment Decision Is Made Early During The Crash Pulse

Car crashes like this one start and finish in fractions of a second. Because airbags are predictive in nature, they must make deployment decisions early on during the crash pulse based on crash severity in the initial milliseconds of the crash. Though Mr. Caruso agreed that it was reasonable for the system to make a deployment decision within the first 45 milliseconds of the crash pulse, he expressly ignored this.

Instead, Mr. Caruso's flawed methodology involved a calculation which, among other things, erroneously considered the ***full length*** of the crash pulse, rather than the initial window of time when the decision to deploy or not deploy the airbag must be made.

Specifically, in his March 24, 2026 Supplemental Report, Mr. Caruso sought to refine his initial calculation of the Equivalent Barrier Velocity (EBS). Mr. Caruso purports to explain his "work." (Caruso Supplemental Expert Report at 7-10, attached as Exh. E).

In doing so, he mixes in data from a 12-mph full frontal rigid barrier crash test run by Ford for the development of the 2013 Fusion. Mr. Caruso then concludes that the crash pulse length of that crash test was 82 milliseconds. (*Id.*). Next, he performs a "simple linear interpolation" using that 82 milliseconds time. (*Id.*). He then pivots to the subject crash, using that 82 millisecond time from the dissimilar crash test, to somehow obtain "estimations for [EBS] at various points in the Delta V curve" for the subject crash. (*Id.*). When he arrives at a Delta-v[5] of 8.1 mph, he then reduces it by 10% to account for rebound because the crash was a rigid barrier impact. (*Id.*). This

[5] Delta-v is a change in velocity.



Error! Unknown document property name.

results in a final EBS for the subject crash of 7.3 mph. (*Id.*). Finally, using that flawed EBS of 7.3 mph, he proclaims that because it is less than 8 mph, it somehow proves that the airbags should not have deployed in this crash. (Exh. A at 94-95, 129, 133).[6] At his deposition, Mr. Caruso was asked if there was any way to validate his interpolation analysis, and he admitted "not exactly" largely because "everything is based on the assumption that the crash pulse is a haversine…." (Exh. A at 130).

Mr. Caruso's methodology is patently flawed. At the outset, EBS is not a measure typically used by sensor engineers to evaluate the performance of an airbag crash sensing system. Leaving this aside, it is undisputed that this crash was ***not*** a full frontal rigid barrier crash at 12 mph; Plaintiff struck a wooden utility pole, the recorded impact speed for the subject crash was above 28 mph, and the recorded Delta-v for the crash was 21.7 mph. (Exh. A at 73, 77-80, 128-29; Exh. C at 1).

Most critically, however, Mr. Caruso's calculation necessarily relies on crash severity data even ***after*** the deployment decision was made. Crash severity data after the decision to deploy was made cannot be used to arrive at any reliable calculation involving this crash. It results in a calculation that is not only flawed (using a linear interpolation of crash data), but also irrelevant and ultimately, meaningless.

Mr. Caruso's methodology is unreliable. It violates the underlying and fundamental premise of airbag deployment engineering, i.e., the airbag must deploy in time to protect. Of

---

[6] Mr. Caruso testified that a typical crash pulse in a rigid barrier crash lasts 100 milliseconds. (Exh. A. at 76). His original report was based on this. Afterward, when he went back to look at the actual crash data, he realized that the equivalent barrier pulse duration lasted 82 milliseconds (not 100 milliseconds), but that is the full length of the crash pulse, not the crash pulse up to the time of the deployment command, which occurs much earlier. (*Id.* at 76; Exh. E at 8). Accordingly, in his rebuttal report he revised his initial estimation of the EBS.

necessity, the system cannot – and does not – operate with the benefit of hindsight. Yet hindsight is the running current forming the basis for Mr. Caruso's methodology. His analysis, considering crash data points after the airbag deployed, violates settled principles of airbag engineering. In performing its gatekeeping function, the court is asked to distinguish between "evidence [that] is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Chapman v. Procter & Gamble Distrib.*, 766 F.3d 1296, 1306 (11th Cir. 2014). Mr. Caruso's opinion here falls in the latter category. *See also Bliv, Inc. v. Charter Oak Fire Ins. Co.*, 159 F.4th 539, 543 (8th Cir. 2025) ("The district court's role as the gatekeeper requires it "to discern expert opinion evidence based on good grounds from subjective speculation that masquerades as scientific knowledge."). It results in no more than impermissible *ipse dixit*. *Joiner*, 522 U.S. at 146.

Because it is unreliable and irrelevant, it results in an opinion that will not assist the jury in deciding the issues in the case and should be excluded. Fed. R. Evid. 702; *see also Bliv, Inc.*, 159 F.4th at 543 ("expert testimony that is speculative, unsupported by sufficient facts, or contrary to the facts of the case is inadmissible").

**B. <u>Mr. Caruso's Criticism of Ford's Testing Does Not Provide a Reliable Basis for His Opinion</u>**

Mr. Caruso does not dispute that the vehicle testing conducted by Ford was reasonable. (*Id.* at 83; Exh. D at 20). Nevertheless, he offered two criticisms of Ford's testing which he believed resulted in an "overly sensitive" calibration.

First, he "noted there was a lack of appropriate NO FIRE offset crash testing by Ford which ultimately led to incorrect calibration of the frontal impact crash sensing system." (Exh. D at 12; Exh. A at 44-45). Mr. Caruso testified that although this crash was more in line with 8-mph no deploy threshold, "there was not sufficient non-deploy information for the crash sensing supplier



**Error! Unknown document property name.**

to calibrate to." (*Id.* at 65). In other words, he believed that the testing Ford conducted resulted in a calibration that was "overly sensitive," and would result in "inadvertent deployment." (*Id.* at 45-46, 63; Exh. D at 12).

Yet, when asked what should have been an appropriate no fire offset crash test, Mr. Caruso provided no details:

> Q. So just to be clear, you have not determined that particular no fire offset crash test in terms of the speed, the angle, et cetera, that you think Ford should have run for a no fire condition?
>
> A. I have not.

(Exh. A at 48-49, 130-31).

Instead, Mr. Caruso essentially conceded that he was not qualified to design such a test, stating: "that would be for Ford's biomechanical people to determine . . . the highest speed you'd want to see where no deployment occurs, so I would not be able to opine specifically. . . . " (*Id.* at 48). Mr. Caruso cannot reliably base his opinion of Ford's alleged lack of testing when he is unable to provide the mode, speed, or impact angle for such test.

Second, Mr. Caruso's reliance on test data regarding belted occupants who are "NOT FORWARD" is irrelevant and will not assist the jury. Caruso testified that his opinion that the design is defective because it is "overly sensitive" is based in part on Ford testing related to belted occupants who are in the "non-forward" seating position. He posits that Ford was not able to distinguish between "non forward belted occupants" and "forward belted occupants." (*Id.* at 111-22). From this, he extrapolates that: "the likelihood that it may have misinterpreted our subject crash as something more severe than it actually was, is certainly a ***possibility*** or ***probability***, and we know it did." (*Id.* at 117). Ford "can't meet the higher threshold that they're trying to when the person is not full forward is a good indication that the system is overly sensitive, and it's making decision that are higher than the actual . . . crash test requirement is, so in the case of the 12 [mph],



**Error! Unknown document property name.**

it's supposed to be a no fire. They can't keep it off, and so the bottom line is what else can't they keep off?" (*Id.* at 118; *see also* 133-34; Exh. D at 12).

Mr. Caruso's analysis is flawed in at least two respects. The system's performance in the "belted non forward" position is entirely irrelevant to this case where it is undisputed that Plaintiff was in the "belted forward" position. Moreover, Mr. Caruso should not be permitted to hypothesize in terms of "possibilities" and "probabilities." This analysis cannot for the basis for his opinion. *Bliv, Inc.*, 159 F.4th at 543.

## II. ANY PROBATIVE VALUE TO MR. CARUSO'S OPINION IS SUBSTANTIALLY OUTWEIGHED BY THE DANGER OF UNFAIR PREJUDICE TO FORD, AND, IMPORTANTLY, MISLEADING AND CONFUSING THE JURY

Mr. Caruso relies on essentially meaningless data, i.e., what happened after deployment, and builds an entire opinion based on it. Any probative value that this opinion may have – and it has none – is substantially outweighed by the danger of unfair prejudice. Even more so, it is substantially outweighed by the danger that it will mislead or confuse the jury. It gives the jury the impression that the airbag system is able to make a decision with the hindsight the system would have if it could wait until the end of the crash. But, of necessity, the airbag system does not have the benefit of hindsight. Allowing someone – donning the cloak of an expert – to present this misleading and confusing testimony to a jury outweighs any probative value. Fed. R. Evid. 403.

## CONCLUSION

Based on the foregoing, Ford respectfully requests that the Court preclude Mr. Caruso's opinions as set forth herein.

Dated: August 19, 2026

Respectfully submitted,

*/s/ Robert V.P. Waterman, Jr.*

Robert V.P. Waterman, Jr. AT0008339
Abbey C. Furlong AT0010610
LANE & WATERMAN LLP
220 North Main Street, Suite 600
Davenport, IA 52801
(563) 324-3246
Fax: (563)324-1616
Email: bwaterman@l-wlaw.com
Email: afurlong@l-wlaw.com

and

Patrick X. Fowler
SNELL & WILMER LLP
One East Washington Street, Suite 2700
Phoenix, AZ 85001
(602) 382-6213 (direct)
(602) 382-6070 (fax)
pfowler@swlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of August, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system,

*/s/ Robert V.P. Waterman, Jr.*
Robert V.P. Waterman, Jr.